IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA** : **Crim. No. 1:19-CR-0064**

:

**v.** :

:

**TERRANCE HARDEN** : **Judge Sylvia H. Rambo**

# M E M O R A N D U M

Before the court are Defendant Terrance Harden's objections (Docs. 48, 52) to the magistrate judge's report and recommendation (Doc. 51), which recommends that the court deny Mr. Harden's motion to suppress (Doc. 26). For the reasons set forth below, the court will adopt the report and recommendation in part and deny the motion.

## I.  BACKGROUND

After a de novo review of the record, the court adopts the report and recommendation's thorough statement of the facts with limited exception.[1] (Doc. 51,

---

[1] The court does not adopt the report and recommendation's finding that Mr. Harden had previously been "found in possession of suspected drug paraphernalia." (Doc. 51, p. 2.) As Mr. Harden correctly points out, it was actually his girlfriend that was found to possess the paraphernalia. Nor does the court adopt the magistrate judge's finding that the encounter between Mr. Harden and Agent Geedey was not investigative in nature (Doc. 51, p. 3) because, as observed below, Agent Geedey took possession of and inspected the contents of Mr. Harden's money wad for investigative reasons.

pp. 1-7.) In brief, the motion to suppress before the court centers on the March 31, 2018 search of Mr. Harden's vehicle. (*See* Doc. 26-5, p. 2.) That day, Mr. Harden reported to his parole center for a monthly drug test. Before entering the restroom to provide a urine sample, he was required to empty his pockets. (Doc. 26-3, p. 1.) Upon doing so, the parole agent that was supervising the test, Agent Aaron Geedey, observed that Mr. Harden possessed two sets of keys—one of which contained a yellow tag that is common among auto shops—despite the fact that he lacked driving privileges. (*Id.*; Doc. 42, pp. 7:22-24, 11:23-24, 43:20.) Mr. Harden went on to provide Agent Geedey with an implausible explanation for having the keys (Doc. 26-3, p. 1; Doc. 42, p. 50:1-9), and his vehicle was found parked several blocks away from the parole center despite the availability of an adjacent parking lot.[2] (Doc. 26-4; Doc. 42, pp. 65:13-19, 66: 1-8.)

Agent Geedey also observed after Mr. Harden emptied his pockets that he possessed a money wad with a $20 bill on the outside. (Doc. 42, p. 43:22-23.) Agent Geedey inspected the money wad and found that it contained around $170 and was organized by denomination, which according to him was consistent with the manner

---

[2] Mr. Harden's claim that he possessed car keys because he took them from his girlfriend after she drove him to the parole center and they got in a fight, because he did not want her to leave without him, is suspicious given the parole agents' credible testimony that parolees routinely drive to the center in violation of their parole and subsequently take steps to hide that they did so. (Doc. 42, p. 66:15-21.) Mr. Harden's objection to the contrary is unpersuasive. (Doc. 48, ¶ 8.)

in which drug dealers organize their money. (Doc. 26-3, p. 1, Doc. 42, pp. 46:10-12, 81:17-22.)

In addition, the parole agents observed Mr. Harden act increasingly nervous and worried during his time at the parole center.[3] (Doc. 26-3, p. 1; Doc. 42, p. 23:14-16.) They also witnessed him type on his phone a panicky Facebook message asking someone to immediately pick him up from the parole center when leaving at that time would have violated the terms of his parole. (Doc. 26-4; Doc. 42, pp. 50:25-51:11, 60:20-61:1, 79:6-8.) After eventually detaining him, the agents further noticed that Mr. Harden was so upset that he had trouble speaking. (Doc. 42, p. 64:1-5.)

Given these observations—and aware that Mr. Harden was a generally non-compliant parolee who had tested positive for marijuana on several occasions and associated with those that possess drugs—the parole agents determined there was reasonable suspicion for believing that evidence of a parole violation would be found in his vehicle. The parole agents therefore conducted a warrantless search of the vehicle and found various contraband including a handgun, ammunition, and cocaine. (Doc. 26-5, p. 2.)

---

[3] The court disagrees with Mr. Harden's objection that the record lacks support that he displayed nervousness. (Doc. 48, ¶ 9.) The parole agents specifically observed Mr. Harden anxiously pace the waiting room and repeatedly alternate between standing, sitting, leaning on a railing, and looking out the door as if he was expecting someone to arrive. (*See* Doc. 26-3, p. 1; Doc. 42, p. 54:4.)

In February 2019, based largely on the evidence recovered from the search, a federal grand jury returned a three-count indictment charging Mr. Harden with possession with intent to distribute cocaine base and fentanyl in violation of 21 U.S.C. 841(a)(1), possession of a firearm in furtherance of a drug trafficking crime in violation of 18. U.S.C. 924(c), and possession of a firearm by a prohibited person in violation of 18 U.S.C. 922(g)(1).

In October 2019, Mr. Harden moved to suppress the physical evidence recovered in the search. (Doc. 26.) Mr. Harden's motion argues that Agent Geedey seized and searched his keys and money wad in violation of the Fourth Amendment, that the evidence seized should be suppressed and not considered in determining whether reasonable suspicion existed for searching Mr. Harden's vehicle, and that the parole agents lacked reasonable suspicion for searching the vehicle. (Doc. 26, pp. 3, 6.)

After referring the motion to suppress to Magistrate Judge Carlson, he held an evidentiary hearing and issued a report and recommendation recommending that the motion be denied. (Docs. 42, 45, 51.) In his report and recommendation, the magistrate judge found that the seizure of Mr. Harden's money wad and keys was justified under the plain-view doctrine and that the agents had reasonable suspicion for searching the vehicle. (Doc. 51.) Mr. Harden filed timely objections. (Docs. 48, 52.) The matter is thus ripe for review.

## II.  STANDARD OF REVIEW

A district court may refer a pending motion to suppress to a magistrate judge for a report and recommendation. 28 U.S.C. § 636(b)(1)(B); *United States v. Raddatz*, 447 U.S. 667, 683 (1980). Where a party objects to a magistrate judge's report and recommendation, the district court must review those contested portions using a de novo standard of review. *See* 28 U.S.C. § 636(b)(1)(C). In performing this review, the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* § 636(b)(1).

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1 (1978) (citing *Simmons v. United States*, 390 U.S. 377, 389–390 (1968)). The government, however, "bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005). "The applicable burden of proof is by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

## III.   DISCUSSION

### a.  Agent Geedey seized Mr. Harden's possessions in violation of the Fourth Amendment.

Mr. Harden initially argues that the magistrate judge should have found that Agent Geedey's instruction to Mr. Harden to empty his pockets was an unreasonable

search. The court disagrees with this objection. The report and recommendation properly concluded that Agent Geedey's instruction did not violate the Fourth Amendment because it was in accordance with the parole center's standard policy that requires all parolees to empty their pockets before providing a urine sample. The purpose of the policy is non-investigatory; it is designed to prevent parolees from cheating on drug tests, furthering the government's substantial interest in supervising parolees to ensure their successful re-entry. As the report and recommendation found, this requirement is therefore a reasonable component of the parole center's commonplace policy, the type of which has withstood Fourth Amendment scrutiny, that agents directly observe the collection of urine specimens. (Doc. 51, p. 11 (collecting cases).)

Next, Mr. Harden argues that the magistrate judge should have found that Agent Geedey seized Mr. Harden's money wad and keys in violation of the Fourth Amendment. The court agrees with this objection. A seizure of property occurs "when there is some meaningful interference with an individual's possessory interests in that property," a concept derived from the "oft-repeated definition of the 'seizure' of a person within the meaning of the Fourth Amendment-meaningful interference, however brief, with an individual's freedom of movement." *United States v. Jacobsen,* 466 U.S. 109, 114 (1984).

Here, Agent Geedey seized Mr. Harden's money wad by taking possession of it after Mr. Harden emptied his pockets and entered the restroom to provide a urine sample. He did so not to ensure the integrity of the drug test but to inspect and investigate its contents, as demonstrated by him subsequently flipping through the money. (Doc. 26-3.) By exercising dominion and control over the money wad for investigatory reasons, Agent Geedey seized it purposes of the Fourth Amendment.[4]

As Mr. Harden correctly argues, Agent Geedey's actions were not justified by the plain-view doctrine. The plain-view doctrine permits an officer to seize an item in certain situations where its incriminating nature is immediately apparent. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Here though, the incriminating nature of the money wad could not have been apparent to Agent Geedey, since he did not know before the seizure that it was organized in a manner that is purportedly common among street drug dealers. (Doc. 42, p. 43:18-23.) Nor could he have suspected that the money was tied to any potential criminal activity since he learned only after the seizure that Mr. Harden was unemployed. (Doc. 42, p. 54:12-18.)

---

[4] It also appears that Agent Geedey may have searched the money wad in violation of the Fourth Amendment when he "flipped through the money," and "proceeded to look at the denominations." (Doc. 42, p. 11:25; Doc. 26-3, p. 1.) The search was unreasonable because, for the reasons observed in the court's discussion of the plain-view doctrine, Agent Geedey had no basis for viewing the money wad as suspicious and he therefore could not have reasonably suspected that it contained evidence of a parole violation. Nevertheless, given the court's finding that the evidence of the money wad's internal contents cannot be considered in determining whether the parole agents had reasonable suspicion for searching Mr. Harden's vehicle, it need not definitely rule on whether Agent Geedey's search violated the Fourth Amendment.

Given the absence of any other constitutional justification for his actions, the court finds that Agent Geedey's seizure of Mr. Harden's money wad violated the Fourth Amendment. As such, Agent Geedey's observations about the money wad's internal contents and organization—both products of his unlawful actions—cannot be factored into whether reasonable suspicion existed for searching Mr. Harden's vehicle. The report and recommendation's findings to the contrary are not adopted.

The keys, however, are a different story. In sharp contrast to Agent Geedey's candid statements in his report and testimony that he took possession of and searched through the money wad, there is little support that he did so with the keys. In fact, the only indication that Agent Geedey ever touched the keys is a comment in his testimony that after Mr. Harden left the restroom, he handed back to Mr. Harden "all of his stuff" from the cabinet on which it was set.[5] (*See* Doc. 42, pp. 11:23-12:3.)

It is arguable whether handing back Mr. Harden's keys under the circumstances meaningfully interfered with his possessory interests in them, but the court will presume it did so to effectuate a seizure. In doing so, the court also finds, contrary to the report and recommendation's conclusion, that any such seizure was unreasonable and not justified by the plain-view doctrine because, as Mr. Harden

---

[5] On the stand, Agent Geedey also agreed that he had previously testified to "examin[ing]" the contents of Mr. Harden's pockets, including the keys, while Mr. Harden was in the restroom. (Doc. 42, p. 13:3-10.) However, that prior testimony reveals that Agent Geedey's "examination" of the keys was done through mere observation. (*Id.*, p. 11:23-24.)

points out, the keys could not have appeared incriminating to Agent Geedey since he only later learned that Mr. Harden lacked driving privileges. (*Id.*, p. 15:23-24.)

Though Agent Geedey may have unreasonably seized the keys in the brief moment he handed them to Mr. Harden, there is no reason to believe he learned anything from doing so. Agent Geedey's report and testimony consistently and credibly maintain that he witnessed Mr. Harden remove two sets of keys from his pockets and place them on the ledge of the cabinet, that he could see at that time that one set contained a tag commonly associated with auto shops, and that it was these observations that caused him to inquire about the keys and investigate whether Mr. Harden had a license.[6] (*See* Doc. 26-3, p. 1; Doc. 42, pp. 11:23-24, 43:18-20, 47:20-48:1.) Agent Geedey also later made the same observations regarding the keys when Mr. Harden tried a second time to produce a urine sample and again emptied his pockets, and there is no contention that a seizure occurred in that instance. (*See* Doc. 26-3, p. 1.) Accordingly, Agent Geedey's initial observation that Mr. Harden possessed what he suspected were car keys may be considered in deciding whether reasonable suspicion existed for the subsequent search of the vehicle.

---

[6] The inconsistencies between the parole agents' various testimony, as well as between their reports and testimony, are minor and do not suggest any lack of forthrightness. More importantly, none of the inconsistencies have any bearing on the court's ultimate determination that the agents had reasonable suspicion to search the vehicle. Mr. Harden's request for a de novo hearing is therefore denied. (Doc. 45, p. 13.)

**b. <u>The parole agents had reasonable suspicion for searching Mr. Harden's vehicle.</u>**

Even after excluding from consideration the evidence uncovered from Agent Geedey's unlawful seizure of the money wad, the court agrees with the report and recommendation's conclusion that the agents had reasonable suspicion for searching Mr. Harden's vehicle for the reasons set forth below.

The Fourth Amendment generally requires officials to have probable cause and a warrant to conduct a search. "In the case of parolees, however, the requisite level of suspicion is reduced and a warrant is not required" if "reasonable suspicion" exists to conduct a warrantless search or seizure. *United States v. Baker*, 221 F.3d 438, 443 (3d Cir. 2000). To determine whether reasonable suspicion exists, the court "must look at the totality of the circumstances of each case to see whether the officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu,* 534 U.S. 266, 273 (2002) (internal citations and quotation marks omitted). This determination draws on "context and commonsense, mindful that it is something less than what is required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable." *United States v. Henley*, 941 F.3d 646, 651 (3d Cir. 2019) (internal citations and quotation marks omitted). It also "permits officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu,*

534 U.S. at 273 (2002) (citing *Cortez*, 449 U.S. at 418). Thus, to decide whether a warrantless search is supported by reasonable suspicion, the court asks whether the facts and circumstances known to the parole agent "would warrant an agent of reasonable caution to have a particularized basis for believing evidence of criminality would be found" in the search. *Henley*, 941 F.3d at 652.

Here, by the time the parole agents searched Mr. Harden's vehicle, they had observed his nervous demeanor and attempt to flee the center in violation of parole by asking for someone to immediately pick him up. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."). The parole agents further noticed that after Mr. Harden was detained in handcuffs, he reacted with such agitation that he was shaking and could barely speak. (Doc. 42, p. 64:1-19.)

Crucially, the parole agents were also aware that Mr. Harden had a lengthy history of testing positive for drugs on parole, with his parole agent estimating that at the time, Mr. Harden had tested positive for marijuana on six of his last nine monthly drug tests. (Doc. 42, 93:6-16, Doc. 26-5, p. 1.)  Consistent with a long line of persuasive authority, this fact alone lent strong support for the search. *See United States v. Crews,* 494 F. App'x 240, 244 (3d Cir. 2012) (finding that probation officer had reasonable suspicion to search probationer's residence "the moment that [he]

tested positive for opiates, marijuana, and cocaine"); *United States v. Hurt*, 295 F. App'x 541, 542 (3d Cir. 2008) ("Because Hurt was on parole, the officers needed only 'reasonable suspicion' that they would find evidence of a parole violation in Hurt's apartment. Given, among other considerations, the positive drug test and the parole officer's knowledge that drug users typically store their drugs at home, the officers met this standard."); *United States v. Tirado,* 133 F. App'x 13, 16 (3d Cir. 2005) (commenting that "a positive drug test alone has been held to be reasonable suspicion to support a search of a probationer's residence")*; United States v. Randle*, 639 F. Supp. 2d 560, 565 (E.D. Pa. 2009) (holding that parolee's positive cocaine test provided reasonable suspicion for searching his residence and vehicle because "testing positive for cocaine clearly implies that a person might possess cocaine for future ingestion or distribution"); *see also United States v. Loney*, 331 F.3d 516, 523 (6th Cir. 2003) (finding that parole officer's knowledge of parolee's "extensive drug past while under supervision" contributed to reasonable suspicion for searching his bedroom).

Alongside Mr. Harden's several positive drug tests was the parole agents' knowledge that he associated while on parole with those that possess drugs, since a few months prior the agents had seized crack cocaine and a scale from Mr. Harden's

residence that was found inside his girlfriend's purse.[7] (Doc. 26-5, p. 1.) This knowledge also supported reasonable suspicion. *See United States v. Davilla*, 69 F. App'x 537, 541 (3d Cir. 2003) (finding that parolee's association with a person known to be involved with drugs and guns supported reasonable suspicion for searching his apartment).

The parole agents' observations regarding Mr. Harden's suspicious behavior and anxious disposition, combined with their knowledge of his multiple positive drug tests and association with those that possess drugs, provided them with a particularized basis for reasonably suspecting that evidence of a parole violation or criminality would be found in his nearby vehicle.

In his objections, Mr. Harden argues that his nervous actions inside the parole center and his Facebook message telling someone to pick him up cannot support reasonable suspicion for searching his vehicle. (Doc. 49, p. 6-8.) According to Mr. Harden, a reasonable parole agent would have interpreted his conduct as merely reflecting his concern that he might get caught driving without a license. (*Id.*) Parole agents, however, are not duty bound to assume the best, and their suspicion at the time that Mr. Harden may have driven to the parole center without a license neither immunized him from further suspicion nor precluded the agents from also assessing

---

[7] Notably, the parole agents seized the crack cocaine and scale from the same female that Mr. Harden claimed drove him to the parole center. (*See* Doc. 26-5, p. 1; Doc. 42, p. 127:1-16.)

his unsettled behavior as potentially signifying something more serious. This is especially true given Mr. Harden's parole and drug history and the agents' assessment that he "wasn't afraid" to commit minor parole violations. (Doc. 42, p. 109:17-19.) Moreover, Mr. Harden's successful flight from the parole center would itself have been a parole violation. (*Id*., pp. 50:25-51:11.) It was not unreasonable to suspect, then, that Mr. Harden's attempt to flee the center, together with his concerning demeanor and his track record on parole, reflected a desire to avoid charges and parole violations more serious than unlicensed driving.

Mr. Harden similarly objects and argues that the parole agents' observation that he became agitated after being detained cannot support reasonable suspicion for the search because a reasonable agent would have interpreted his behavior as nothing more than anxiety from being handcuffed. (Doc. 48, ¶ 10.) Mr. Harden is correct that it is not uncommon for people to exhibit uneasiness from being detained, and it is beyond debate that a nervous demeanor, without more, does not give rise to reasonable suspicion. *See United States v. Alvin*, 701 F. App'x 151, 155 (3d Cir. 2017). Mr. Harden showed particular distress following his detention, however, with one parole agent describing him as visibly shaking, stuttering and "[v]ery, very nervous" to such a degree that "you could tell his words weren't forcefully coming out." (Doc. 42, p. 64:1-5.) Those observations also came against the backdrop of Mr. Harden's anxious behavior prior to being detained, as well as everything that was

known about his drug and parole history. Faced with that information, and though far from dispositive, it was not unreasonable for the agents to interpret Mr. Harden's reaction to being detained as potentially suggesting more than just anxiety from being handcuffed.

Finally, Mr. Harden objects to the magistrate judge's finding that the agents had a reasonable basis for suspecting that evidence of a crime or violation was located in his particular vehicle. This objection is also unavailing. The parole agents quite rationally suspected that Mr. Harden suddenly and nervously tried to find a ride away from the center, in violation of his parole, to prevent them from uncovering evidence of another crime or violation. (*See e.g.*, *id.*, p. 62:12-19.) Given that they already knew the items Mr. Harden had on his person—from when he emptied his pockets and also from when the agents searched him after detaining him—the parole agents also understandably suspected that the evidence he was trying to prevent from being discovered involved his keys and nearby vehicle. (*See e.g.*, Doc. 26-5, pp. 1-2.) Presented then with Mr. Harden's ostensible desire to distance himself from the vehicle (or the agents from the keys to the vehicle), his unsettled demeanor, and his parole and drug history, the parole agents had

reasonable suspicion to conclude that evidence of a crime or parole violation was located in the vehicle.[8]

The core problem with Mr. Harden's arguments is that they invite the court to cast aside each individual piece of evidence that is capable of an innocent or alternative justification at the expense of viewing that evidence as a collective whole. In analyzing whether reasonable suspicion exists, however, "courts must look at the totality of the circumstances," and "[t]he fact that each of the observations of the parole authorities is by itself readily susceptible to an innocent explanation is entitled to no weight." *Davilla*, 69 F. App'x at 540; *see also United States v. Valentine*, 232 F.3d 350, 356 (3d Cir. 2000) ("In many cases the Supreme Court has found reasonable suspicion based on acts capable of innocent explanation.").

Mr. Harden may have acted nervous simply because he committed a minor parole violation by driving without a license. He may have tried to flee the parole center simply to avoid being caught for that minor violation. And he may have been distraught after being detained simply because it is stressful for anyone to be placed in handcuffs. The parole agents, however, were entitled to weigh those observations against everything else they knew about Mr. Harden, draw on their own experience

---

[8] The court agrees with Mr. Harden's objection that the agents did not have reasonable suspicion for believing that evidence of him driving without a license would be located in the vehicle, and the magistrate judge's conclusion to the contrary will not be adopted. *Cf. United States v. Baker*, 221 F.3d 438, 445 (3d Cir. 2000).

and training, and "make inferences from and deductions about the cumulative information available to them." *Henley*, 941 F.3d at 651–52 (quoting *Arvizu*, 534 U.S. at 273.) They were not required to give Mr. Harden the benefit of the doubt each step of the way, and presented with the collective evidence—including Mr. Harden's increasingly uneasy and evasive behavior, his slew of positive drug tests and association with people that possess drugs, and his general non-compliant parole history—the parole agents had specific bases for reasonably believing that evidence of a crime or parole violation would be found in Mr. Harden's nearby vehicle.

## IV.  CONCLUSION

For the reasons set forth above, Mr. Harden's motion to suppress will be denied. An appropriate order shall follow.


*/s/ Sylvia H. Rambo*
Sylvia H. Rambo
United States District Judge

Dated: October 16, 2020.